**KORI CORPORATION and Huey J. Rivet, et al., Plaintiffs-Appellees,**

v.

**WILCO MARSH BUGGIES AND DRAGLINES, INC., et al., Defendants-Appellants.**

No. 82–3004.

United States Court of Appeals, Fifth Circuit.

June 27, 1983.

Rehearing Denied Aug. 17, 1983.

and Other Users of Consumer Credit Information, 89 Banking L.J. 410, 423 (1971).

152

Greenberg & Dallam, Nathan Greenberg, Gretna, La., for defendants-appellants.

Keaty & Garvy, Thomas S. Keaty, New Orleans, La., for plaintiffs-appellees.

Before TUTTLE*, POLITZ and GAR-WOOD, Circuit Judges.

POLITZ, Circuit Judge:

The discovery of oil and gas deposits beneath the marshes and swamps of the Gulf South opened vast vistas, offered many opportunities and called for a host of new developments. A form of transportation capable of traversing the neither-land-nor-water character of the wide-open treeless marshes, as well as the obstruction-ridden, stump-studded swamps, was an immediate and pressing need. In 1974, Huey J. Rivet offered a solution with an "Amphibious Marsh Craft" for hauling loads and laying pipeline in the swamp. The instant dispute involves Rivet's marsh patent, infringed, according to the plaintiffs, by the defendants' manufacture of similar craft. After bifurcation, the district court, 561 F.Supp. 512, found the Rivet patent valid and infringed by defendants' vehicle. We affirm.

*Facts*

The Rivet patent, U.S. Patent No. 3,842,-785, describes an endless-track amphibious vehicle, resembling a pontooned army tank, capable of traversing marshes and swampland, carrying loads up to 60 tons over tree stumps and other obstacles. Rivet's buggy finds primary application in oil and gas related transportation and construction, offering an efficient method for laying pipelines through the Louisiana swamps.

Before the advent of the Rivet craft, those venturing into the swamps relied on a marsh craft patented in 1947 by Frank Reynolds. The Reynolds amphibian was originally used in seismic survey work in the open marshes. Its design was not suitable for hauling heavy loads or for movement through swampy areas. In the 1950s this craft was adapted for limited pipeline work by attachment of a small crane to a set of Reynolds-type pontoons. Other modifications included the addition of a backhoe and the reduction of the vehicle's size, both in an effort to avoid damage caused by tree stumps encountered in the swamps.

Despite the adaptations, the Reynolds buggy could not make the transition from treeless marshes to treed swamps, and it could not carry heavy loads without frequent mishaps. Pipeline workers sought to navigate the swamps by "matting," a procedure using huge timber mats to support earthmovers which cleared away the tree stumps. The process was slow, cumbersome and expensive. The mats had to be moved to each new location and, not infrequently, the equipment would slip off the mats and sustain damage. The name of the game was damages and delay. Even with this costly workover of the swamps, the Reynolds craft would break down often, making back-up units necessary to prevent expensive immobilization of construction crews.

Huey Rivet was using this burdensome process while laying pipeline in Mississippi and Louisiana in 1971. Frustration at the inefficiency and construction delays provided the motivation for his invention of a structurally stronger, more watertight buggy. Rivet developed a buggy capable of traversing stump-dotted swampland, actually "walking" over stumps without matting or preclearing. The craft could do so for extended periods, carrying substantial loads. The design resisted the dual banes of previous marsh buggies—pontoon puncturing and weld twisting.

The advantages enjoyed by the Rivet model derived principally from: (1) placement of plastic support blocks on the cleats to prevent pontoon puncturing, (2) spacing of I-beams on pontoon bottoms for support, and (3) creating discrete buoyant chambers by placing vertical bulkheads within the length of the pontoons.

Robert J. Wilson, Sr., father of defendants John M. Wilson, Sr., Dean R. Wilson, and Robert J. Wilson, Jr., worked for Rivet during 1974 as a contract welder. During this time, as found by the district court, Wilson received detailed instructions on the design of the Rivet pontoon. Upon completion of his welding contract with Rivet, Wilson began building Rivet-type pontoons

---

* Circuit Judge of the Eleventh Circuit, sitting by     designation.

for Wilco Marsh Buggies and Draglines, Inc., a corporation formed and owned by his three sons. Wilco bought a Rivet craft and Dean Wilson ordered copies of the Rivet patent. Wilco began the production and sale of a marsh buggy strikingly similar to the Rivet vehicle, especially the model manufactured by Kori Corporation, a Rivet-licensee.

Rivet, Kori, and another licensee, Louis Woodson, filed the instant suit against Wilco and the Wilson brothers, seeking injunctive relief and damages. In the pre-trial bifurcation, the issue of damages, together with claims and counterclaims of unfair competition, libel and trade secret appropriation, was severed.[1] After trial to the bench, the district court found the patent valid and infringed and enjoined further infringement.

### Validity

Relying on the Reynolds patent, recent design improvements in the marsh craft industry, and patents from other fields, Wilco contends that the Rivet patent is invalid because: (1) it was anticipated in the prior art, and/or (2) its claims were obvious to one having ordinary skill in the relevant art.

■ The Rivet patent, like all patents properly issued, is entitled to a presumption of validity. 35 U.S.C. § 282. Wilco bears the burden of showing the invalidity of a patent regular on its face. *E.g., Farmhand, Inc. v. Anel Engineering Industries, Inc.,* 693 F.2d 1140 (5th Cir.1982); *Parker v. Motorola, Inc.,* 524 F.2d 518, 521 (5th Cir.1975) (describing various measures of proof applied and concluding that more than a "mere preponderance of the evidence" is required), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

1. Wilco's appeal originally included an attorneys' fees issue. We noted, and Wilco agreed, that the issue was raised prematurely. By supplemental briefing Wilco waived, at this time, the attorneys' fees appeal, leaving that issue to be considered with the second phase of the bifurcated trial. We find that the issues Wilco ultimately urges to this court are properly before us.

### 1. *Anticipation and the Prior Art*

■ To be patentable, an invention must be novel. 35 U.S.C. § 102. The defense of anticipation, derived principally from § 102(a),[2] is strictly technical, requiring a showing of actual identity in the prior art. *Steelcase, Inc. v. Delwood Furniture Co., Inc.,* 578 F.2d 74 (5th Cir.), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1978). Indeed, "unless all of the same elements or their equivalents are found in substantially the same situation where they do substantially the same work in the same way, there is no anticipation." *Continental Oil Co. v. Cole,* 634 F.2d 188, 195 (5th Cir.) (footnote omitted), *cert. denied,* 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981).

■ The district court found that Wilco failed to establish the existence of any prior art which disclosed all or substantially all of the elements claimed under the Rivet patent. Although Wilco argues that prior public use involved vertical bulkheads, spaced I-beams, and support blocks, there is no suggestion that all three elements were found together in any previous unit. Further, many of the prior uses Wilco urges are in fact found in somewhat similar but distinct situations, such as airplane pontoons. While such uses offer a glimpse of what may have been apparent in the art, they do not provide a sufficient basis upon which to negate novelty. Wilco has not established that the Rivet patent was anticipated in the prior art.

■ Wilco claims that its burden should be lightened in this case and the presumption of validity lessened, suggesting that the prior art placed before the Patent Of-

2. Section 102(a) provides that one is entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent...."

Prior art may also invalidate a patent even where the invention is not identically disclosed as required by § 102, if the distinguishing feature is obvious. 35 U.S.C. § 103.

fice in the course of its review and approval of the Rivet patent was inadequate. *See, e.g., Cathodic Protection Service v. American Smelting & Redefining Co.,* 594 F.2d 499 (5th Cir.), *cert. denied,* 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979). This claim is not supported by the file wrapper. Although Rivet's application did not list every prior art device which contained some element found on his marsh buggy, it presented the Examiner with the pertinent prior art, including the relevant references to each element distinguishing Rivet's craft from Reynolds' and Reynolds-type crafts.

■■■ The *raison d'être* of the prior art requirement includes the notion of fair disclosure by applicants so that the Patent Office may adequately consider previous inventions. Fair disclosure is not endless or absolute disclosure. It suffices if the Patent Office is not misled and has a meaningful opportunity to compare pertinent prior art. We have cautioned in the context of a fair trade/antitrust dispute:

> Fair dealing ... is not a mechanical mandate that every patent ultimately cited by the Examiner in issuing the patent or, more so, by the unlimited industry [of] counsel in a years-later infringement suit in which every writing, periodical, or patent, foreign or domestic, is dredged up as prior art, must be cited in the application.

*Becton, Dickinson & Co. v. Sherwood Medical Industries, Inc.,* 516 F.2d 514, 524 (5th Cir.1975). Wilco has not shown that Rivet inadequately disclosed, or that the Patent Office failed to consider, relevant prior art sufficient to cast doubt upon the patent's validity.

### 2. *Obviousness*

Wilco also claims that the Rivet patent is invalid for obviousness. This defense derives from 35 U.S.C. § 103, which prescribes that no valid patent will issue if the differences between the invention sought to be patented and the prior art are such that the invention "as a whole would have been ob-

vious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

■■■ Wilco again invites our attention to prior art devices which relate to elements of the Rivet invention. But "[t]he linchpin is not whether the individual components of the ... patent were obvious at the time of the invention, but whether the aggregation produced a new or different result or achieved a synergistic effect." *Continental Oil Co.,* 634 F.2d at 197. In this sense the inquiry under § 103 is whether prior use makes the picture on the jigsaw puzzle, rather than its pieces, obvious.

■■■ Because this appeal involves a combination patent, in judging obviousness we look to the aggregate effect. Courts are reluctant to find inventiveness in an amalgamation of old ideas, *see Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), so that combination patents, to be valid, must produce an unexpected, unusual or synergistic result. The inquiry is nothing more than an instance of gestalt analysis: Is the whole greater than the sum of its parts? *Farmhand,* 693 F.2d at 1144–45; *Whitley v. Road Corp.,* 624 F.2d 698 (5th Cir.1980).

■■■ Even though many of the elements of the Rivet patent can be separately found in the prior art, the combination is striking. No previous craft was capable of traveling safely for extended periods through stump-filled swamps. None could carry the heavy loads demanded by oil-related exploration and construction. The improvements to prior craft, were merely quantitative. The one craft combining these features—the Rivet model—made a quantum leap in transportation through the swamp. Other machines may have used two of the three modifications Rivet made, but two-out-of-three did not create a new buggy capable of matching the performance of the Rivet craft.[3] This synergistic effect of the triad modifications belies the charge of obviousness.

---

**3.** Moreover, the record supports an inference that one of these elements—Rivet's pontoon structure—was itself unique and nonobvious, bolstering the court's finding of validity irrespective of the dramatic value of the combination of pontoon, block and I-beam.

**156**

The district court's finding of non-obviousness is further supported by such secondary considerations as commercial success, copying, and previous need and failure. *See Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Continental Oil Co.,* 634 F.2d at 197 & n. 5 (others had tried in vain for three years to produce a working paravane). The limitations of the Reynolds craft, when tested outside its intended uses, were immediately apparent. No definitive improvement was offered for over twenty years. We conclude that the Rivet patent was innovatively different and not readily obvious to one in Rivet's position and is therefore valid.

### Infringement

The final issue is whether Wilco's marsh buggy infringes the Rivet patent. Wilco suggests a number of modifications which, it is claimed, distinguish Wilco's product from Rivet's patent. These alterations may suffice to prevent literal infringement of some of the claims of the Rivet patent, but the doctrine of equivalents gives a patentee broad protection from minor deviations. *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858 (5th Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

We need not belabor the point. Suffice it to say that a comparison of the two craft reveals substantial identity of means, operation and result. The differences are cosmetic and trivial. The essence of both vehicles is the same; each relies on the Rivet improvements. Wilco's models infringe the Rivet patent.

AFFIRMED.